PLEASANT HILL (POLLARD v.). See Case No. 11,253.

## Case No. 11,225.

### Ex parte PLEASANTS.

[4 Cranch, C. C. 314.][1]

Circuit Court, District of Columbia. May Term, 1833.

WITNESS FROM ANOTHER STATE—ATTACHMENT.

A witness residing in Virginia cannot be compelled, by attachment, to attend the circuit court of the District of Columbia, in a criminal cause. By the opinion of Mr. Justice Brockenbrough.

[1] [Reported by Hon. William Cranch, Chief Judge.]

Mr. Key, U. S. Atty., for the District of Columbia, moved the court (MORSELL, Circuit Judge, absent) for an attachment of contempt against John H. Pleasants, who resides in Richmond, in Virginia, for not obeying a summons to attend as a witness on behalf of the United States, before the grand jury of Alexandria county, in the District of Columbia, immediately.

Thomas Woodward, deputy-marshal of the District of Columbia, made affidavit that he served the annexed summons on J. H. Pleasants, in the city of Richmond, in Virginia. The summons was directed to "the marshal of Virginia," and says: "You are hereby commanded to summon John H. Pleasants to appear before the United States judges of the circuit court of the District of Columbia, for the county of Alexandria, at the courthouse in the town of Alexandria, to testify and the truth to say on the behalf of the United States, before the grand jury of the said county of Alexandria; and this he shall in no wise omit, under the penalty of $333.33, and have then there this writ," &c.

Mr. Key made an official statement, in writing and in substance, that Pleasants is editor of the Richmond Whig; that he has seen in the Whig a letter published from some person in Alexandria to some person in Richmond (and produced the paper, the Whig of 8th of May); that the grand jury have now before them for consideration a bill of indictment charging R. B. Randolph and sundry other persons as having conspired to commit an assault upon the president of the United States in the county of Alexandria, and that he expects the said Pleasants can prove, &c.

THE COURT (MORSELL, Circuit Judge, absent) refused to issue an attachment without a previous rule to show cause, which was granted, returnable on the 17th instant; provided a copy of the order, &c., be served on the said Pleasants on or before the 12th instant.

CRANCH, Chief Judge, however had doubts whether the subpoena was well served so as to bring the witness into contempt.

No cause having been shown, upon the return of the rule, an attachment was issued and served by the marshal of Virginia; but he was discharged by Mr. Justice BROCKENBROUGH, upon habeas corpus; who delivered the following opinion, as published in the Alexandria Gazette of the 26th of November, 1833.

Ex parte John H. Pleasants, on a writ of habeas corpus. The applicant is in the custody of the marshal for the Eastern district of Virginia; and has petitioned for, and obtained, a habeas corpus to relieve him from what he alleges to be an illegal detention.

The marshal has made a return to the writ, by which it appears that he arrested the petitioner under authority of an attachment issued from the circuit court of the District of Columbia, for the county of Alexandria, for a

contempt by him committed in not attending the said court as a witness, after being thereto legally summoned. The attachment itself, and the previous proceedings, together with an affidavit of the attorney of the District of Columbia, are annexed to the returns. By these, it appears that the grand jury of that county have before them a bill of indictment charging Robert B. Randolph and others with a conspiracy to commit an assault on the president of the United States, in the said county, and that, in the estimation of the said attorney, the said Pleasants may be a material witness in the said prosecution.

Many important subjects have been brought into view during the discussion; of which 1 shall notice such as I shall deem necessary to enable me to form a correct opinion on the case.

At the very threshold I am met with the objection, that this court cannot take cognizance of the case, because the arrest, of which the applicant complains, has been made by virtue of process of a court of the United States, who alone can judge of the legality of the arrest. This is a delicate question, and is attended with difficulty. When I look to the habeas corpus act, I find that its provisions are very general and comprehensive. It declares, that whenever a person detained in custody, (whether charged with a criminal offence or not,) shall apply for a writ of habeas corpus ad subjiciendum, and shall show by affidavit, or other evidence, probable cause to believe that he is detained in custody without lawful authority, it shall be the duty of the court to award the writ. And the court before whom the prisoner shall be brought, shall proceed to inquire into the cause of his imprisonment, and shall either discharge him, admit him to bail, or remand him into custody, as the law and evidence shall require. In every case in which there is a detention without lawful authority, the court may relieve the party detained. It would seem that if the commitment be made by a court having jurisdiction to commit, the court ought not to discharge, although the judgment of the committing court be erroneous. But if it be made by a court having no jurisdiction, then the discharge may be made.

Without going into the controverted question of commitments made under unconstitutional, and, therefore, void laws, there may be cases, in which, under constitutional and valid laws, a circuit court of the United States may exceed its commission. It may exercise powers which the law will not warrant. By such unwarranted jurisdiction, they may seriously encroach upon the personal liberty of men whom the state courts are bound to protect. Would not the judges, in such cases, neglect their duty if they failed to protect them?

In the present case, a foreign court. that is a court sitting beyond the limits of Virginia, and alleged to have only a local jurisdiction,

has sent its process beyond its own territory, and arrested an individual within the jurisdiction of this court.

I find it to be a general principle that the courts of one state or county cannot issue its process into another, without the consent of that other; but the court of Alexandria claims an exemption from that general principle, and undertakes to arrest a citizen within our jurisdiction. When that citizen claims the protection of our own laws, surely it becomes a proper subject of investigation here, whether that court is bound by the general principle, or comes within the exemption which is claimed.

I am of opinion that I ought to entertain jurisdiction in the case.

A great deal of ingenious and forcible argument has been used, to prove that the federal courts have no right to attach for a contempt of their process, or, indeed, to punish, by attachment, in any case.

I do not, however, agree with the counsel in many of the views he has presented on this subject. In our state courts there is no doubt of the existence of the power. We are in the daily habit of imposing fines, or attaching witnesses who refuse to obey the process of subpœna, and I do not see how courts of justice can perform the business before them, without the exercise of this or some equivalent powers.

My opinion is that the constitution does vest in congress the power of arming their courts with those powers which are necessary to enable them to discharge their duties; and in one case it imperatively requires that the courts should exercise them; for the sixth amendment declares, "that in all criminal prosecutions, the accused shall enjoy the right to have compulsory process for obtaining witnesses in his favor."

Before the establishment of the constitution, it was well known in every state of the Union what was the nature and character of the compulsory process by which the commands of the courts were enforced.

The process of attachment was a well-established process for that purpose; and when the constitution vested congress with the power of establishing courts, the seventeenth clause of the eighth section may fairly be understood as vesting them with power of authorizing those courts to issue attachments, or other process necessary to carry their orders into effect. But I have not yet seen any law of congress which authorizes the circuit courts of the United States, in any case, to issue attachments, to run into another district or state than that in which they are holding their courts. It was deemed necessary to give an express authority, by the act of 1793, to the courts, to issue subpœnas into another district or state. The act did not follow up this grant, by authorizing attachments to run into any other state, in case of disobedience of the process of subpœna.

The service of any kind of process from one state in another state, was, at that time, unusual, and if it was necessary that a law should be passed to sanction that practice, it is much more necessary that the more searching and more compulsory process of attachment should be authorized by law.

If this case, then, rested here, I am of opinion that I should be justified in discharging the prisoner, unless some act of congress can be shown, authorizing a circuit court of the United States to issue attachments into another state than that in which it is sitting. But the investigation which has taken place here, will probably justify, if it does not require, that I should examine the question, whether the circuit court of the District of Columbia has a right to issue process of subpœna beyond the territory of the District in a case arising under the municipal laws of the District.

The judiciary act of 1789, § 14 (1 Stat. 73), declares that the courts of the United States "shall have power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions and agreeable to the principles and usages of law." The act of 1793, § 6 (1 Stat. 333), declares, "that subpœnas for witnesses who may be required to attend a court of the United States, in any district thereof, may run into any other district, provided, that, in civil cases, the witnesses living out of the district in which the court is holden, do not live at a greater distance than one hundred miles from the place of holding the same." These early acts were applicable to the circuit and district courts of the United States, which had been recently established. The district court of Columbia was established afterwards; and, on the 27th of February, 1801, the first act was passed "concerning the District of Columbia" (2 Stat. 103). The first section of that act declared, "that the laws of the state of Virginia, as they now exist, shall be, and continue in force in that part of the District of Columbia which was ceded by the said state to the United States; and that the laws of the state of Maryland, as they now exist, shall be, and continue in force in 'the other part of the District,'" &c. The second section of the act forms the District into two counties, and directs that a court shall be holden in each. The third section organizes the court. It declares, "that there shall be a court in each district," ("county,") "which shall be called the circuit court of the District of Columbia; and the said court, and the judges thereof, shall have all the powers vested in the circuit courts, and the judges of the circuit courts of the United States." It is this latter clause, taken in connection with the sixth section of the act of 1793, which is supposed to confer on the circuit court of Alexandria, the power to issue its process of sub-

pœna, in all cases which may be brought before it, into any other district; and I am now to inquire into the correctness of this opinion.

Let it be remembered, that the courts of the United States, established under the third article of the constitution, are vested with limited powers only. If a case does not arise under the constitution or laws of the United States, or treaties made under their authority; or if it does not affect ambassadors, other public ministers, or consuls; or if it is not one of maritime or admiralty jurisdiction; if it is not a controversy to which the United States are a party, or between two or more states; or between a state and citizens of another state; or between citizens of different states; or between citizens of the same state, claiming lands under grants of different states; or between a state and (or) citizens thereof, and foreign states, citizens, or subjects; if such be not the state of the cases, the federal courts have no jurisdiction. In that large class of cases arising out of the municipal laws of a state, the federal courts have no jurisdiction, the state courts, exclusive jurisdiction. In all cases of crimes committed against a state; in all cases of contract between citizens of the same state; in all cases of alienation, or descent of lands, in which citizens of the same state are concerned; in all cases of meum and tuum, whether in law or equity, between citizen and citizen; in short, in the everyday business of life, between members of the same sovereignty, the state courts alone have the jurisdiction. It is obvious, then, that, large as is the jurisdiction of the federal courts, that of the state courts is much more extensive.

When congress, by their act of 1793 (1 Stat. 333), authorized the process of subpœna to issue from one district to another, the effect was to authorize the circuit courts to send such process beyond the limits of the state in which they were located. But the state courts had no power to send out such extraterritorial process. This, then, was the state of things when the District of Columbia was organized. There were, in each state, two distinct sets of tribunals, emanating from, and belonging to, different political bodies. To the one set was confided the power of issuing process of subpœna out of their own bounds; to the other, it was denied. Thus, the circuit court of the United States, for the district of Virginia, sitting in Richmond, could send a subpœna for a witness, to Maryland; but the district court of Henrico, or the general court of Virginia, sitting in the same place, had no such power. The broad distinction between the subjects of jurisdiction in the two sets of judicial tribunals, was plainly in the view of congress when they undertook the task of providing or adopting a system of laws for the District of Columbia. As the two states had parted with all juris-

diction over the District, and the people contained therein, it became necessary to organize a court or courts for the District. They had the exclusive power of legislating for it. It was in their power to have two sets of courts, as in every other part of the United States; that is, one court to be vested with federal powers, another court with municipal powers. But the size of the territory, and the number of people did not require such a division of courts; and considerations of economy, probably, forbade the appointment of so many judges. They therefore decided on having only one court, which they denominated the circuit court for the District of Columbia. But still they kept up the distinction between federal judicial power, and municipal, or quasi state judicial power; although they conferred both kinds of power on the same court. Thus, in the first section they enacted that the laws of the state of Virginia should continue to be the law of one part of the District, and the laws of Maryland of the other. Previously thereto, the constitution and the laws of the United States had disrobed the states of Maryland and Virginia, as well as the other states, of all those powers which had been conferred on congress, and had disrobed the courts of those states of all those judicial powers which had been conferred exclusively on the federal tribunals. What laws of Virginia and Maryland were thus declared to be in force in the District of Columbia? They are the municipal laws of those states—the laws founded upon the reserved rights of those states. Amongst those laws of Virginia and Maryland which are thus continued in force in the District, I will ask whether there were any which authorized the process of the courts of the one to run into, and be exercised in the other? Very far from it. On the contrary, it was a fixed principle of those laws that the process of their courts should not issue beyond their territory. When the laws of Virginia and Maryland were adopted for the District, by this section, that principle was adopted with them, and consequently the process of the courts of this District, so far as it was required to carry into effect those laws, could not issue beyond the territory of the District.

I presume it will not be contended, that, as before the cession, process could run from Alexandria into the different counties of Virginia; so, after the cession, by the adoption of the Virginia laws, the process of Alexandria will still run into Virginia. It this should be said, it will be answered, that, by the cession, Alexandria and a part of Fairfax were cut off from Virginia so as to be no longer any part of her territory; and process, therefore, could no longer run from Virginia into that separated territory, nor vice versâ.

Amongst the laws of Virginia, thus adopted by congress, were the laws concerning assaults and conspiracies. These were common-law offences, and the punishment for them was plainly prescribed. In neither of these cases, nor in any other case, of either criminal or civil character, was there any law of Virginia (nor is there now,) by which a witness could be taken by process of a Virginia court, from any place beyond her territory, and brought to Virginia to testify. This may be a defect, but it is one which grows out of our political conditions, and can only be remedied, I presume, by the consent or agreement of the state. Such is the character of the laws of Virginia and Maryland which were adopted for the District of Columbia, by the first section of the act of February, 1801. Congress, in thus prescribing for the District a code of municipal laws, intended to act for them in the same character that the legislatures of the several states act towards the people of their several states. They had previously provided for them a set of federal laws, in common with the rest of the United States. For, as the District, in a different form, and under its former organization, as parts of two states, had always been, and still continued, a part of the United States, the laws, previously enacted by congress, growing out of the granted powers, were still applicable to them, and it was not thought necessary to reënact them specially for the District. Thus, the people of the District were immediately provided with two sets of laws, municipal and federal. It then became necessary to provide a court or courts, to carry into effect, within the District, as well the federal as the municipal laws. They created one court for the whole district, and vested it with "all the powers, by law, vested in the circuit courts of the United States." Section 3.

It has been argued that as the sixth section of the act of 1793, declared that subpœnas for witnesses who may be required to attend a court in any district, may run into any other district, so the circuit court for the District of Columbia, being vested with the same powers, may direct subpœnas to run, in all cases of which they have cognizance, from their district into any other district. But this, I apprehend, is a non sequitur. The power conferred by this third section, on the circuit court of Columbia, is the same with that conferred on the other circuit courts, and not greater. What, then, were the powers quoad hoc, conferred on the other circuit courts? To issue subpœnas into another district, in cases, before them, of which they had cognizance, that is, in federal, not municipal cases; of these latter they have no jurisdiction, and, therefore, cannot, in such cases, issue subpœnas into another district. But the circuit court of Columbia has the same powers with those of the other circuit courts; that is to say, they have the power, in federal cases, to issue subpœnas to another district; but in municipal cases, in cases arising under the laws of Virginia and Maryland, they have no such power. To allow

them the power in such cases, is not to give them merely all the powers belonging to the other circuit courts; but more than all; which cannot be allowed. They would have more powers on this subject than all the other courts, state and federal combined, if this were permitted. If, instead of blending all the judicial powers of the District, federal and municipal, in the same court, they had been separated as they are in every state in the Union, there would be no difficulty on this subject. If, after adopting the laws of Virginia and Maryland, in the first section, they had created a court to carry into effect the federal laws of the Union, and vested that court with all the powers abiding in the circuit courts of the United States, every one would see, that whilst to the latter the power in question was given, from the former it was withheld.

If to any one it seems strange that the courts of the same district should have a power, or not, according as the subject before them is of a federal or a municipal character, I can only say that a similar spectacle may be seen in every state in this Union. If a man be charged with robbing the mail in Henrico, and be brought before the circuit court of the United States sitting in Richmond, the judges of that court may send their process for the witnesses to any district, that is, any state in the Union. If the companion of that man be charged with robbing, on the highway, passengers in a private carriage, and be brought before the circuit court of Henrico for trial, the judge of that court cannot send process for witnesses to Alexandria, Baltimore, or any other place out of the state. It has been said, that the congress of the United States in legislating for the District of Columbia acts as the congress of the whole United States, and not as the legislature of that particular place. I cannot understand this doctrine. The laws of the United States, passed by virtue of the powers specified in the first fifteen clauses of the eighth section, apply to the people and territory of the ten miles square, in common with the rest of the people of the United States. But the 16th section gives to congress power to exercise exclusive legislation over that district. This power consists of two parts: (1st) the specific given power of federal legislation; and (2d) the residuum of legislative power which, in other cases, is reserved to the states. This residuum is, surely, as much local as is the legislative power of the states. Congress stands, to the District, in the same relation that the state legislatures do to the respective states. And as a state legislature can only legislate for its own state, and cannot enforce its laws beyond its own limits, so neither can congress, in legislating for the District, cause its district laws to be carried into effect in the states without their concurrence. The total legislation of the states is made up of federal legislation by congress, and of local legislation by the state legislatures. How can the legislation of the District consist of more parts? All that it can ask is, federal and local jurisdiction. If, in addition to these, you give it a local legislation which is to operate generally, not in that place only, but in all other places, you mar the beauty and symmetry of the whole federal system, and confer on congress a power of doing, indirectly, that which it cannot directly perform. Congress cannot pass municipal laws for the states: but if, in passing municipal laws for the District, they can affect or impair the municipal laws of the states, they do legislate for the states on those municipal subjects. In taking this view of the constitution, I should say that congress had no right to pass any law directing the process of the courts of Columbia to run into any of the states for the purpose of enforcing the merely municipal laws of the District, though these municipal laws be enacted or adopted by congress itself. I do not, however, think that they have, as to this matter, passed such a law; as I have already endeavored to prove.

Upon the whole, I am clearly of opinion, that the applicant is detained in custody without lawful authority, and that he must be forthwith discharged. See U. S. v. Williams [Case No. 16,712], in this court, at November term, 1833.

———

PLEASANTS (GOYON v.). See Case No. 5,647.